**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Robert Adell Brown, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING DEFENDANT'S** |
| | ) | **MOTION FOR SUMMARY JUDGMENT,** |
| vs. | ) | **FINDING AS MOOT DEFENDANT'S** |
| | ) | **MOTION IN LIMINE, AND FINDING** |
| | ) | **AS MOOT PLAINTIFF'S MOTION** |
| | ) | **FOR EXTENSION OF TIME** |
| | ) | |
| Flying J, Inc., | ) | |
| | ) | Case No. 1:08-cv-059 |
| Defendant. | ) | |

Before the Court is the Defendant's motion for summary judgment filed on May 15, 2009.

<u>See</u> Docket No. 29.  The Plaintiff filed a response in opposition to the motion on June 19, 2009.

<u>See</u> Docket No. 31.  The Defendant filed a reply brief on June 26, 2009.  <u>See</u> Docket No. 34.  On

July 20, 2009, the Defendant filed a motion in limine.  <u>See</u> Docket No. 40.  On August 12, 2009, the

Plaintiff filed a motion for an extension of time to respond to the Defendant's motion in limine.

<u>See</u> Docket No. 46.  Oral argument was held in Bismarck, North Dakota on July 28, 2009.  For the

reasons set forth below, the Court grants the Defendant's motion for summary judgment and finds

as moot the Defendant's motion in limine and the Plaintiff's motion for an extension of time.


I.      <u>**BACKGROUND**</u>

The defendant, Flying J, Inc., operates a travel plaza in Beach, North Dakota which consists

of a convenience store and a restaurant.  On September 14, 2006, the plaintiff, Robert Brown,

applied for a position as a cook at Flying J.  Brown signed and dated a Flying J employment

application which read, in part:  "I understand that [if] employed, I am responsible to know of and

comply with all company policies and guidelines including those contained in the company Policy Manual and Employee Handbook.  I agree to read, understand and comply with them."  <u>See</u> Docket No. 30-3.  Brown also signed a "Deduction/Withholding of Wage Authorization" form in which he acknowledged the following:  "I, Robert A. Brown hereby acknowledge that I have read, understand, and will abide by the rules, regulations, and service standards of the employee handbook, and the Interstate Operations Manual.  I understand that failure to comply with policies or guidelines may result in disciplinary action, including termination."  <u>See</u> Docket No. 30-3.  On September 14, 2006, Flying J hired Brown as a cook.  During Brown's employment at Flying J, Art French was the district manager, Hazel Hill was the general manager, Mat Jones was the assistant manager, and Kathy Ferderer was the kitchen manager.

On or about March 20, 2007, Tami Morey, a non-supervisory employee of Flying J, allegedly pushed a buffet cart toward Brown and said, "Leave me alone, you black bastard."  <u>See</u> Docket No. 30-2, p. 22.  Brown testified that he immediately reported the incident to assistant manager Mat Jones and general manager Hazel Hill.  Flying J investigated Brown's allegations and terminated Tami Morey on March 21, 2007.  On March 23, 2007, several Flying J employees informed Mat Jones that Brown approached them and offered them $1,000 to physically harm or kill Tami Morey.  On March 23, 2007, Flying J terminated Brown.

On April 13, 2007, Brown filed a charge of discrimination with the North Dakota Department of Labor, alleging discrimination and retaliation in violation of the North Dakota Human Rights Act (N.D.C.C. ch. 14-02.4) and Title VII of the Civil Rights Act of 1964, on the basis of race and/or color and/or participation in a protected activity.  Brown alleged the following in his charge of discrimination:

I began working as a buffet cook on 09/14/06. During my employment, I was never given a letter of reprimand or been negatively involved with any work place hostility or violence. I have performed my job in a satisfactory manner. Tami Romeo (aka Tami Morey), co-worker, has been involved consistently in daily work place physical confrontations and loud shouting matches. The management has overlooked and dismissed this negative behavior as harmless. This behavior has been on-going since 09/14/06 and continuing through 03/23/07. Ms. Morey was not terminated from employment or reprimanded for creating a hostile work environment even though clearly, Ms. Morey was dangerous and a real threat to my health and safety. On or about 03/12/07, Ms. Morey was served with a long overdue letter of reprimand; the contents are unknown to me. On or about 03/20/07, approximately 1 hour and 45 minutes into my 3:00 pm assigned shift, Ms. Morey refused to perform her routine task(s) as buffet attendant and soup and salad bar person. As the buffet cook, my position is directly affected by her insolence, so I asked Ms. Morey about the situation, whereupon I received this loud angry reply and physical assault: "You black bastard, leave me alone," while simultaneously jamming a food cart into my midsection and then she began throwing punches at me with a clenched fist. I was so surprised and angered by her behavior that I said, "I don't have to put up with this crap," and walked to the rear of the restaurant and exited the freight door to the outside. Outside, I met Hazel Hill and Mat Jones, restaurant managers. I was so upset that I needed to go home, and at that point Ms. Hill took over my cooking duties. On or about 1:00 pm, 03/21/07, I received a telephone call from Mr. Jones who verbally invited me to meet with him to discuss the awful, ugly situation that had occurred on 03/20/07 with Ms. Morey. I met with Mr. Jones on that same day at 2:30 pm at the restaurant. Ms. Hill, who is Mr. Jones' boss, was not at this meeting. Mr. Jones was embarrassed for Flying J and Ms. Morey and offered a disingenuous apology to me. Furthermore, during this discussion, Mr. Jones said, "We don't want you to leave," and that Ms. Morey had been "dealt with," whatever that meant. Mr. Jones would not elaborate. I agreed to return to work on 03/22/07 at 3:00 pm. I returned to work on that day with great trepidation and for good reason; Thursday evening was quite slow and there wasn't anybody/workers in the kitchen including the buffet runner from 5:00 pm until 8:00 pm. However, there were two local white men who sat at tables in the restaurant adjacent to the kitchen door between me and the dining room. This was about 8:30 pm. I decided to see for myself if these two individuals were a threat to my life. I opened the kitchen door and the two men hastily fled the restaurant. On Friday, 03/24/07, I was fired in the parking lot of the restaurant by Mr. Jones and Wade (last name unknown), managers of the restaurant. The reason I was given for termination was allegedly threatening to retaliate against Ms. Morey. I asked Mr. Jones and Wade for a written notice of the allegations and a list of the so-called witnesses hearsay to the threats. I was given nothing and have yet to receive any response. Furthermore, I have been barred from the premises of Flying J in Beach, North Dakota.

See Docket No. 30-3.

On June 20, 2007, the North Dakota Department of Labor determined that the evidence did not establish a violation of the North Dakota Human Rights Act or Title VII of the Civil Rights Act of 1964.  See Docket Nos. 30-3 and 32-11.  Because Brown filed the charge under both a state and federal act, the North Dakota Department of Labor notified Brown that he could seek further review of his Title VII claims by notifying the Equal Employment Opportunity Commission (EEOC) within fifteen days from the date of the determination.  Brown sought further review from the EEOC and received a notice of his "right to sue."  The administrative charges are labeled NDDOL#NDE0710077 and EEOC#32F-2007-00060.

On May 27, 2008, Brown timely filed a pro se action in federal district court, alleging that Flying J violated his rights under 18 U.S.C. § 245, the North Dakota Human Rights Act, and Title VII.  Brown seeks the following relief:  "Reinstatement of Employment"; "Reinstatement of Seniority"; "Reinstatement of Pension and Welfare Benefits"; "$1,000,000.00 (One Million Dollars) in monetary damages"; "$500,000.00 (Five Hundred Thousand Dollars) in compensatory damages"; "Cost of Suit and other compensation(s) deemed just and appropriate by the court"; and "Back Wages from March 20th, 2007 thru the conclusion of the pending legal action."  See Docket No. 1.


## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(c).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party bears the burden of demonstrating an absence of a genuine issue of material fact.  Simpson v. Des Moines Water Works, 425 F.3d 538, 541 (8th Cir. 2005).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).


## III.   LEGAL DISCUSSION

In Brown's complaint, he alleges that the action falls under 18 U.S.C. § 245.  The claims which he raises are consistent with the claims alleged in his administrative complaints to the North Dakota Department of Labor and EEOC.  Therefore, the Court will also consider whether Brown has raised a genuine issue of material fact on his North Dakota Human Rights Act and Title VII claims.


### A.   18 U.S.C. § 245

Brown seeks to assert a civil claim for money damages under 18 U.S.C. § 245.  The statutory provision which Brown seeks relief from is 18 U.S.C. § 245(b)(2)(C) which provides:

> (b)   Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with –

    (2)      any person because of his race, color, religion or national origin and because he is or has been –

          (C)      applying for or enjoying employment, or any prerequisite thereof, by any private employer or any agency of any State or subdivision thereof, or joining or using the services or advantages of any labor organization, hiring hall, or employment agency.

shall be fined under this title, or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire shall be fined under this title, or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death. As used in this section, the term "participating lawfully in speech or peaceful assembly" shall not mean the aiding, abetting, or inciting of other persons to riot or to commit any act of physical violence upon any individual or against any real or personal property in furtherance of a riot. Nothing in subparagraph (2)(F) or (4)(A) of this subsection shall apply to the proprietor of any establishment which provides lodging to transient guests, or to any employee acting on behalf of such proprietor, with respect to the enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of such establishment if such establishment is located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor as his residence.

18 U.S.C. § 245 derives from Section 2 of the Civil Rights Act of 1866, which made it a federal misdemeanor for any person "under color of any law" to "subject or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act . . . ." United States v. Lane, 883 F.2d 1484, 1488 (10th Cir. 1989). 18 U.S.C. § 245 is a criminal statute that makes it a crime, enforceable by the Department of Justice, for a person to interfere with another person's ability to apply for or enjoy employment because of the applicant's race, color, religion, or national origin. 18 U.S.C. § 245 does not create a private right of action. Accordingly, Brown is not entitled to relief under 18 U.S.C. § 245. Summary judgment is granted on this claim.

6

B.      **TITLE VII**

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "Employer" means "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . . ."  42 U.S.C. § 2000e(b).  "Employee" means "an individual employed by an employer . . . ."  42 U.S.C. § 2000e(f).  The parties do not dispute that Flying J is an employer, and Brown is an employee, for purposes of Title VII.

1.      **HOSTILE WORK ENVIRONMENT**

Brown asserts a Title VII race-based hostile work environment claim.  To establish a prima facie case for hostile work environment, Brown is required to show:  (1) that he is a member of a protected class; (2) that he was subjected to unwelcome harassment; (3) that the harassment was based on race; (4) that the harassment affected a term, condition, or privilege of his employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action.  Vajdl v. Mesabi Acad. of KidsPeace, Inc., 484 F.3d 546, 550 (8th Cir. 2007).  The standard for a hostile work environment claim is relatively stringent:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 843 (8th Cir. 2002) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-23 (1993)).  To determine whether a work environment is hostile, the court considers the totality of the circumstances.  "Merely offensive conduct is not enough absent the requisite effect on the terms or conditions of employment.  Title VII does not 'impose a code of workplace civility.'"  Woodland, 302 F.3d at 843 (quoting Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 567 (2000)).

First, Brown must establish that he is a member of a protected class.  There is no dispute that Brown, an African American, is a member of a protected class.

Second, Brown must establish that he was subjected to unwelcome harassment.  Brown alleges one instance of harassment, namely, that while working at Flying J on March 20, 2007, co-worker Tami Morey pushed a buffet cart toward him and stated, "Leave me alone, you black bastard."  Brown testified that he was so distraught over the racial remark that he left work early that day.  The Court finds that Brown was subjected to unwelcome harassment on March 20, 2007.

Third, Brown must establish that the harassment was based on race.  It is clear that Tami Morey's remark was based on race.

Fourth, Brown must establish that Tami Morey's remark affected a term, condition, or privilege of his employment.  In order to satisfy this factor, Brown must show that Tami Morey's conduct was so severe as to "create an *objectively* hostile work environment that altered the terms, conditions, or privileges of employment."  Willis v. Henderson, 262 F.3d 801, 808 (8th Cir. 2001) (emphasis in original).  To determine whether Tami's harassment affected a term, condition, or privilege of Brown's employment, the Court must consider "'all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Cottrill v. MFA, Inc., 443 F.3d 629, 636 (8th Cir. 2006) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)). "While a single harassing act might not be actionable standing alone, it can be actionable as a constituent element of a larger hostile environment claim." Engel v. Rapid City Sch. Dist., 506 F.3d 1118, 1124 (8th Cir. 2007). "Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment." Elmahdi v. Marriott Hotel Services, Inc., 339 F.3d 645, 652 (8th Cir. 2003).

Brown testified that he made a single complaint to Flying J management of racial harassment, namely, on March 20, 2007, for the remark made by Tami Morey:

| | |
|---|---|
| Q. [Counsel for Flying J]: | Prior to March 20th, 2007, you'd never made a complaint about Tami Morey at Flying J, had you? |
| A. [Brown]: | No, sir. |
| Q. [Counsel for Flying J]: | Prior to March 20th, 2007, when you made the complaint about Tami, you'd never complained about anybody else at Flying J, had you? |
| A. [Brown]: | I never complained about anybody, that's right. I never complain about anybody. |

See Docket No. 30-2, p. 25. Nonetheless, Brown alleges that Tami Morey had a history of exhibiting racially hostile behavior:

Flying J knew or should have known with a degree of certainty that Tami Morey in the past had exhibited hostile and Anti-Black attitudes toward Brown; Tami had been verbally counseled and she had received two written disciplinary reprimands[.] Tami Morey should have been terminated. Whereas, Flying J's, negligent retention of Tami Morey after March 12, 2007, did indeed under the prevailing circumstances create a hostile work environment.

9

See Docket No. 31.  During oral argument, Brown generally described a pattern of angry and confrontational behavior by Tami Morey, but he did not specify any additional racial comments made by her.

The Eighth Circuit has addressed offensive language similar to that at issue here and found it insufficient to create a hostile work environment.  See Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046 (8th Cir. 2007) (finding that a supervisor's conduct of asking an employee whether he had a harem, how many wives he had as a Muslim, and whether he rode camels around everywhere in Egypt did not create a hostile work environment); Gordon v. Shafer Contracting Co., 469 F.3d 1191 (8th Cir. 2006) (finding that three or four racial slurs directed at an African American employee did not create a hostile work environment because such a limited number of offensive comments was insufficient to create a hostile work environment); Canady v. Wal-Mart Stores, Inc., 440 F.3d 1031 (8th Cir. 2006) (finding that a supervisor's use of racial slurs in reference to an African American employee did not create a hostile work environment); but see Ross v. Douglas County, Neb., 234 F.3d 391 (8th Cir. 2000) (holding that a supervisor's constant use of racial epithets towards an African American employee was sufficient to create a hostile work environment).  In viewing the totality of the circumstances and relevant Eighth Circuit case law, the Court finds that the single racial remark made by Tami Morey on March 20, 2007, did not affect a term, condition, or privilege of Brown's employment.

Fifth, Brown must establish that Flying J knew or had reason to know that Brown was being racially harassed and failed to take prompt remedial action.  The undisputed evidence establishes that Brown did not complain to Flying J management of any racial harassment prior to March 20, 2007.  Flying J terminated Tami Morey on March 21, 2007, one day after she made the offensive,

racist remark to Brown.  During oral argument, Brown indicated that Tami Morey performed her job poorly as a buffet attendant at Flying J, made racial remarks to him in the past, and was confrontational in the workplace.  While Tami Morey may have exhibited poor job performance and been confrontational while working at Flying J, that poor job performance and confrontational behavior did not put Flying J on notice of ongoing racial harassment.  Further, Brown testified that prior to March 20, 2007, he had never complained to Flying J management of any racial harassment in the workplace.  There is simply no evidence in the record to indicate that Flying J management was present and observed previous instances of racial harassment by Tami Morey, nor is there any evidence that Flying J was aware that Tami Morey had racially harassed Brown prior to March 20, 2007.  Brown first complained to management about racial harassment on March 20, 2007.  Flying J promptly investigated Brown's complaint and immediately terminated Tami Morey on March 21, 2007, one day after Brown complained to Flying J management.  The Court finds that Flying J dealt with Brown's complaints against Tami Morey in a prompt and effective manner, which included investigating Brown's complaints and terminating Tami Morey the following day.  Accordingly, the Court finds that Brown has failed to raise a genuine issue of material fact of a hostile work environment claim.  Summary judgment is granted on this claim.

### 2.      RACIAL DISCRIMINATION

Title VII makes it unlawful for an employer to "discharge an individual . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Brown's racial discrimination claim is analyzed under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this framework, the plaintiff bears

the initial burden of establishing by a preponderance of the evidence a prima facie case of Title VII racial discrimination. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802. Once this showing is made, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. <u>Id.</u> If the employer offers such a reason, the burden then shifts back to the plaintiff to establish by a preponderance of the evidence that the employer's reason is in reality a pretext for unlawful discrimination. <u>Id.</u> at 804, 805.

To establish a prima facie case of Title VII racial discrimination, Brown must establish that (1) he is a member of a protected class; (2) was qualified to perform his job; (3) suffered an adverse employment action; and (4) was treated differently than similarly-situated employees who were not members of the protected class. <u>Philip v. Ford Motor Co.</u>, 413 F.3d 766, 768 (8th Cir. 2005).

First, the Court has determined that Brown, an African American, is a member of a protected class. Second, the parties do not dispute that Brown was qualified to perform his duties as a cook. Third, the parties agree that Flying J terminated Brown on March 23, 2007. Fourth, the parties dispute whether Brown was treated differently than similarly situated employees.

On March 23, 2007, Flying J terminated Brown after three employees notified management that Brown offered to pay them for harming or killing Tami Morey:

> Q. [Counsel for Flying J]:  Who told you you were terminated?
>
> A. [Brown]:  Matt Jones, in the parking lot.
>
> . . .
>
> Q. [Counsel for Flying J]:  I understand you said the parking lot. I'm not asking you about that. I'm asking you what date.
>
> A. [Brown]:  March 23rd.
>
> Q. [Counsel for Flying J]:  And did he give you a reason for your termination?

| | |
|---|---|
| A. [Brown]: | No. |
| Q. [Counsel for Flying J]: | He just said, You're terminated? |
| A. [Brown]: | Right. |
| Q. [Counsel for Flying J]: | He didn't tell you that you were terminated because you had offered to harm – to pay money for someone to harm Tami? |
| A. [Brown]: | No.  He said that he had heard, and I said, Well, do you have something in writing?  And they didn't give me nothing.  They said they would – well, you know, they hemmed and hawed and said they didn't have to. |
| Q. [Counsel for Flying J]: | So he said he heard you'd made that threat? |
| A. [Brown]: | Yes. |
| Q. [Counsel for Flying J]: | And he told you that's why he was terminating you? |
| A. [Brown]: | Right. |

<u>See</u> Docket No. 30-2, pp. 24-25.  Brown testified at his deposition that he was unsure as to the actual reason for his termination:

| | |
|---|---|
| Q. [Counsel for Flying J]: | Do you believe that the reason Matt Jones gave you for your termination, specifically that he had heard you made a threat about Tami, do you think that was what truly motivated him?  Was that the real reason for your termination, as far as you're concerned?  Or do you know? |
| A. [Brown]: | I don't really know.  I don't really know. |

<u>See</u> Docket No. 30-2, p. 25.

Brown states that Flying J treated him differently than similarly-situated employees who were of a different race than Brown.  Brown contends that white employees at Flying J made threats to physically harm other employees and were not terminated.  The names of the white employees

13

that Brown mentions include Scott Wicka, Tami Morey, Ellen Connaughton, Pamela Rohde, Marge

Eskre, three dishwashers, and Roxanne Gordon.

Brown provides two instances describing Scott Wicka.  The first instance regards Scott

Wicka inappropriately touching employee Alyssa Littlecreek:

> Scott Wicka on or about February 16, 2007, was accused by Alyssa Littlecreek (a
> high school girl) of inappropriately touching and rubbing his body against Alyssa.
>
> No police were called, no criminal complaint were made, Alyssa Little
> creek's parents were not contacted and Scott Wicka, a white man of about 35 years
> old was suspended for two weeks and he returned to his job; Working right along
> side Alyssa Littlecreek.  Scott Wicka was not fired.

See Docket No. 31 (errors in original).  The second instance regarding Scott Wicka involved a "road

rage" incident with Tami Morey, where Tami allegedly cut off Scott.  Scott Wicka later threatened

"to kick her ass," but management did not terminate him.  Brown indicated that he and two other

employees witnessed the incident, but he refused to provide the names of the witnesses.

Brown testified that, on an unidentified date, Tami Morey was involved in an altercation with

Marge Eskre.  Brown states, "Tami had a fight with Marge Eskre.  Marge Eskre grabbed her around

the head."  See Docket No. 30-2, p. 28.  Brown failed to provide the names of any witnesses who

observed the incident.

Brown testified that an altercation ensued at Flying J on an unidentified date when Ellen

Connaughton flirted with Pamela Rohde's son.  Brown states,

> Ellen Connaughton was flirting with Mrs. Rohde's son.  He's married and so is Ellen
> and they were flirting in the restaurant, and Ellen's husband came there one night
> and also her mother-in-law – I mean, her mom and her father, and they were going
> to have a big riot out there in that restaurant and they had Pamela's son scared to go
> out to his car, and someone called Matt Jones and Matt Jones came over, and Ellen
> Connaughton's husband is about 6-3 and he said what he was going to do, and Matt
> Jones said, You're not going to do anything.  And he said, Oh yeah, we're going to

> toss this place up.  And there was a lot of commotion, and there were people in there,
> too – guests.

See Docket No. 30-2, pp. 28-29.  Ellen Connaughton's husband was not an employee of Flying J

at the time of the alleged incident.

Brown testified that in January 2007, Pamela Rohde threatened her son who was also an

employee of Flying J:

> Pamela came to the restaurant one night.  She's not very stable.  She came to the
> restaurant one night and she was screaming at her son, who was a line cook – they
> both were line cooks, but he was working that night and she wasn't.  She came in
> there screaming at him and said, You're not my son anymore and you better get your
> so-and-so over to the house right away because I'm going to burn up all your clothes,
> witnessed by Miss Hill and also Kathy Ferderer and myself.

See Docket No. 30-2, p. 29.

Brown testified that, on an unidentified date, Marge Eskre and Tami Morey were involved

in an altercation at Flying J.  Brown states,

> Marge got into it with Tami because Tami refused to do her work, would push the
> work off onto Marge or would try to tell Marge what to do, and Marge would ask
> Tami to do her own stuff.  They would split the workload and Tami wouldn't do her
> work, she would come and bother Marge, and so Tami swung at Marge or said
> something to Marge, but Marge grabbed her before she knew what was up and
> Marge was going to take – was going to beat her up pretty bad.

See Docket No. 30-2, p. 29.  Brown admitted that he did not witness the incident involving Marge

Eskre and Tami Morey, nor does he know who witnessed it.

Brown testified that an unidentified dishwasher was involved in an altercation with high

school girls.  Brown states,

> Well, [the dishwasher] got into it with one of the – he got into it with the young girls
> from the high school, and he said that the reason that things were so messy around
> there and that they didn't want to dump the garbage off the plates from the customers
> is because they were just there for a paycheck, little high school groupies and they
> should be fired, and so that touched off a storm.

See Docket No. 30-2, p. 29.  Brown did not indicate who witnessed the incident.

Brown testified that two additional dishwashers were involved in altercations at Flying J:

One of them was Ellen Connaughton's brother and he got into it – the other kid was a brother to one of the waitresses, and they got into it.  They were having problems with their high school and the kids would come over to the restaurant and they would say, you know, don't come over here or we'll punch you out, and there was little groups – little groups would come and sit in the back of the restaurant and they would torment them and antagonize them and then they would walk out to the front of the restaurant and would almost engage in fisticuffs.

See Docket No. 30-2, p. 29.

Brown testified that Roxanne Gordon threatened Pamela Rohde at work.  Brown stated, "Roxanne Gordon would threaten Pamela Rohde and tell her that she would punch her out and don't mess with me and don't mess with Tami, because Tami is a bad person."  See Docket No. 30-2, p. 30.  Brown was unable to identify any individuals who observed the incident.

The Court finds that the incidents involving Scott Wicka are distinguishable from the present case.  The first incident involving Scott Wicka concerned the alleged inappropriate touching of another employee.  In the present case, Flying J alleges that Brown agreed to pay three co-workers $1,000 for harming or killing Tami Morey.  The Court finds that the alleged conduct in the two situations are distinguishable because the incident involving Scott Wicka did not regard a threat on someone's life.  The second incident involving Scott Wicka threatening Tami Morey is also distinguishable because there is no evidence that management at Flying J either observed or was aware of the altercation.

The Court finds that the remainder of the incidents described by Brown are distinguishable from the present case.  The additional incident regarding Tami Morey involved a physical altercation with Marge Eskre, but the record is devoid of any evidence that Flying J management either

16

observed or was aware of the incident.  The incident regarding Ellen Connaughton involved her husband, a non-employee,  making threats against Flying J employees.  The incident regarding Pamela Rohde did not involve threatening an employee's life.  The incident regarding Marge E. involved a physical altercation with Tami Morey, but the record is devoid of any information that Flying J management either observed or was aware of this incident.  The record is devoid of any evidence that Flying J management either observed or was aware of the incidents regarding the three dishwashers.  The incident involving Roxanne Gordon involved a verbal threat against Pamela Rohde, but the record is devoid of any evidence that Flying J management either observed or was aware of the incident.  Accordingly, the Court finds that each of the incidents described by Brown involving a white employee is distinguishable from the Defendant's allegation that Brown approached three different employees and offered to pay them $1,000 to physically harm or kill Tami Morey.

Brown has failed to provide any evidence that Flying J has allowed a non-African American employee to remain employed at Flying J despite allegations that the employee threatened the life of a co-worker.  Accordingly, the Court finds that Brown has failed to raise a prima facie case of racial discrimination under Title VII.  Summary judgment is granted on this claim.


### 3.     <u>RETALIATION</u>

Brown next alleges that he was terminated from Flying J on March 23, 2007, because he complained to management of racial harassment.  "Title VII's anti-retaliation provision prevents employers from retaliating against employees who have acted to vindicate their statutorily protected rights by reporting harassment or discrimination in the workplace."  <u>Brannum v. Missouri Dep't of</u>

Corr., 518 F.3d 542, 547 (8th Cir. 2008).  To analyze a retaliation claim under Title VII, the

McDonnell Douglas three-part burden-shifting analysis is applied.  See Erenberg v. Methodist

Hosp., 357 F.3d 787, 793 (8th Cir. 2004).  The plaintiff carries the initial burden of establishing by

a preponderance of the evidence a prima face case of retaliation.  The employer is then required to

rebut the resulting presumption of retaliation by articulating a legitimate reason for terminating the

plaintiff.  If the employer provides a legitimate reason, the plaintiff is then required to provide

sufficient evidence that the employer's reason is a pretext for retaliation.

To establish a prima face case of Title VII retaliation, Brown must demonstrate that "(1) he

engaged in protected conduct by either opposing an act of discrimination made unlawful by Title

VII or participating in an investigation under Title VII; (2) he suffered an adverse employment

action; and (3) the adverse action was causally linked to the protected conduct."  Eliserio v. United

Steelworkers of Am. Local 310, 398 F.3d 1071, 1078-79 (8th Cir. 2005).  "'Protected activity' in

this context includes opposition to employment practices prohibited under Title VII; however, a

plaintiff employee need not establish that the conduct he opposed was in fact prohibited under Title

VII; rather he need only demonstrate that he had a 'good faith, reasonable belief that the underlying

challenged conduct violated [Title VII].'"  Bakhtiari v. Lutz, 507 F.3d 1132, 1137 (8th Cir. 2007)

(quoting Buettner v. Arch Coal Sales Co., 216 F.3d 707, 714 (8th Cir. 2000)).

First, Brown must establish that he engaged in protected conduct by either opposing an act

of discrimination or participating in an investigation under Title VII.  To satisfy this element, a

"plaintiff need only report the alleged wrongful activity.  There is no additional requirement that the

plaintiff report the perceived failure of the company to take proper remedial action."  Green v.

Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 914 (8th Cir. 2006).  Protected activity includes

18

"'an informal or formal complaint about, or other opposition to, an employer's practice or act . . . if the employee reasonably believes such an act to be in violation of the statute in question.'" Jeseritz v. Potter, 282 F.3d 542, 548 (8th Cir. 2002) (quoting Sherman v. Runyon, 235 F.3d 406, 409 (8th Cir. 2000)).

On March 20, 2007, Brown complained to assistant manager Mat Jones and general manager Hazel Hill that Tami Morey had pushed a buffet cart towards him and stated, "Leave me alone, you black bastard." Brown left work early that day because he was too distraught over Tami Morey's racial remarks to work the entire shift. Brown also made a formal complaint to the North Dakota Department of Labor on April 13, 2007, alleging violations of the North Dakota Human Rights Act and Title VII, and sought further review of the Title VII claims by the EEOC. The Court finds that Brown has established that he opposed an act of discrimination by reporting Tami Morey's racial remarks to Flying J management and filing charges of discrimination with the North Dakota Department of Labor and EEOC, and that he possessed a good faith belief that the opposed behavior was discriminatory. Accordingly, the Court finds that Brown satisfies the "protected activity" requirement.

Second, Brown must establish that an adverse employment action was taken against him. On March 23, 2007, Flying J terminated Brown. The Court finds that Brown satisfies this requirement.

Third, Brown must establish that the adverse employment action was causally related to his involvement in the protected activity. In other words, Brown must show that he was terminated from Flying J as a result of complaining to Flying J management on March 20, 2007, of Tami Morey's statements. In the complaint, Brown alleges:

19

> March 20, 2007, at or about 4:45 pm, Robert A. Brown was assaulted with a food transport cart in the kitchen of FLYING J's Restaurant and called a 'Black Bastard' by Tami Morey, a Buffet Line helper.
>
> At the time of this dastardly activity (4:45 pm. approx.) there were no managers present in the kitchen, however, there were several other kitchen workers present in the kitchen of FLYING J in Beach, North Dakota.
>
> Robert A. Brown walked out of the kitchen, very upset and in search of the shift Supervisors, Hazel _____ and or Mat Jones.  Hazel _____ and Mat Jones were on break in the rear of the Restaurant.
>
> Robert A. Brown spoke to Hazel _____ and Mat Jones regarding the situation/assault by Tami Morey and that he (R. Brown) was going home because he was too upset to continue his shift.  Robert A. Brown left the Restaurant and went home very concerned for his safety and well being.
>
> On or about March 21, 2007, at or about Mat Jones telephoned Robert A. Brown at his residence and requested a short meeting at FLYING J Restaurant to apologize for the behavior of Tami Morey and to ask Robert not to quit or leave FLYING J.  Mat Jones ask Robert A. Brown to return to work and Robert agreed to return to work on March 22, 2007 for his regular shift.  Tami Morey did not work and was not present in the Restaurant of FLYING J on March 22, 2007.

See Docket No. 1 (errors in original).  Brown concedes that assistant manager Mat Jones contacted him on March 21, 2007, apologized for Tami Morey's conduct, and asked him to return to work. Flying J terminated Tami Morey on March 21, 2007.  On March 23, 2007,  Flying J employees informed management that Brown offered to pay them $1,000 to physically harm or kill Tami Morey.  Pamela Rohde, Sharon Rogers, and Alyssa Littlecreek provided handwritten statements to Flying J management describing this conversation with Brown.

The Court finds that Brown has failed to provide any evidence that he was terminated from Flying J on March 23, 2007, as a result of complaining to assistant manager Mat Jones and general manager Hazel Hill of the racial statements made by Tami Morey on March 20, 2007.  The evidence reveals that, after Brown complained to management of Tami Morey's remarks, Flying J wanted

Brown to return to work. Flying J terminated Brown's employment <u>after</u> several employees reported that Brown offered to pay them money to physically harm or kill Tami Morey. The record is devoid of any evidence that Flying J terminated Brown because he complained to management of the racial remarks made by Tami Morey. Accordingly, the Court finds that Brown has failed to establish a genuine issue of material fact that Flying J retaliated against him for complaining of racial harassment. Summary judgment is granted on this claim.

### C.     NORTH DAKOTA HUMAN RIGHTS ACT

The North Dakota Human Rights Act is codified at N.D.C.C. ch. 14-02.4. The North Dakota Human Rights Act makes it unlawful for an employer to discriminate on the basis of, among other things, a person's race, color, age and sex:

> It is a discriminatory practice for an employer to fail or refuse to hire a person; to discharge an employee; or to accord adverse or unequal treatment to a person or employee with respect to application, hiring, training, apprenticeship, tenure, promotion, upgrading, compensation, layoff, or a term, privilege, or condition of employment, because of race, color, religion, sex, national origin, age, physical or mental disability, status with respect to marriage or public assistance, or participation in lawful activity off the employer's premises during nonworking hours which is not in direct conflict with the essential business-related interests of the employer.

N.D.C.C. § 14-02.4-03. "Employee" means "a person who performs services for an employer, who employs one or more individuals, for compensation, whether in the form of wages, salaries, commission, or otherwise." N.D.C.C. § 14-02.4-02(7). "Employer" means "a person within the state who employs one or more employees for more than one quarter of the year and a person wherever situated who employs one or more employees whose services are to be partially or wholly performed in the state." N.D.C.C. § 14-02.4-02(8). The North Dakota Human Rights Act is a state statute which parallels Title VII of the Civil Rights Act of 1964. As a result, the North Dakota

Supreme Court looks to federal interpretations of Title VII for guidance in interpreting the North

Dakota Human Rights Act.  See Opp v. Source One Mgmt., Inc., 591 N.W.2d 101, 105 (N.D. 1999).

The Court has determined that Brown has failed to raise a genuine issue of material fact as to a Title

VII violation.  Accordingly, the Court likewise finds that Brown has failed to raise a genuine issue

of material fact as to a North Dakota Human Rights Act violation.  Summary judgment is granted

on this claim.


IV.    **CONCLUSION**

The Court finds that there are no genuine issues of material fact in dispute.  The plaintiff,

Robert Brown, is a very articulate, sincere, hard-working individual who seemed to enjoy working

at Flying J in Beach, North Dakota.  Tami Morey appears to have been a troublesome co-worker.

The Court sympathizes with Mr. Brown and the fact that he had to work with such a neanderthal.

However, the first time Brown complained to management about Tami Morey making crude, racist

comments to him, she was promptly fired.  The assertions fall short of establishing a genuine issue

of material fact of a violation of 18 U.S.C. § 245, a hostile work environment, racial discrimination,

or retaliation under Title VII.  For the reasons set forth above, the Defendant's motion for summary

judgment (Docket No. 29) is **GRANTED**.  The Court **FINDS AS MOOT** the Defendant's motion

in limine (Docket No. 40).  The Court **FINDS AS MOOT** the Plaintiff's motion for an extension

of time to file a response to the motion in limine (Docket No. 46) because the Court has found that

the motion in limine is moot.

       **IT IS SO ORDERED**.

       Dated this 14th day of August, 2009.

                              */s/ Daniel L. Hovland*                
                              Daniel L. Hovland, Chief Judge
                              United States District Court